**ORIGINAL**

# INTEREST-ONLY PERIOD FIXED RATE NOTE

August 17, 2007                    Bloomfield                         NJ
　[Date]                              [City]                         [State]

65 Newark Avenue, Bloomfield Township, NJ  07003
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 325,000.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Weichert Financial Services

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      7.500 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month. This payment will be for interest only for the first  120      months, and then will consist of principal and interest.

I will make my monthly payment on the  1st      day of each month beginning on  October 1, 2007      . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on September 1, 2037      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 225 Littleton Road, Morris Plains, NJ 07950
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,031.25      for the first  120      months of this Note, and thereafter will be in the amount of U.S. $ 2,618.18      . The Note Holder will notify me prior to the date of change in monthly payment.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment

MULTISTATE INTEREST-ONLY PERIOD FIXED RATE NOTE–Single Family–Fannie Mae UNIFORM INSTRUMENT
Form 3271 1/01 (rev. 9/06)
Wolters Kluwer Financial Services
VMP®-836N (0509).01
Page 1 of 3                    Initials: A.V.

unless the Note Holder agrees in writing to those changes. However, if the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, the amount of my monthly payment will not decrease; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of f i f t e e n      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      5.000 % of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

VMP ®-836N (0809).01                            Page 2 of 3                            Form 3271 1/01 (rev. 9/06)

Initials A. V.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Angel X Valentin Jr_ _____ (Seal)          _____ (Seal)
Angel Valentin                  -Borrower                                     -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                     -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                     -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                     -Borrower

*[Sign Original Only]*

VMP®-836N (0806).01                          Page 3 of 3                          Form 3271 1/01 (rev. 9/06)

**PAY TO THE ORDER OF:**

**WITHOUT RECOURSE**
**WEICHERT FINANCIAL SERVICES**

BY: _Wanda Moody_
Wanda Moody
Supervisor

# RECORDING INFORMATION SHEET

**ESSEX COUNTY  REGISTER'S OFFICE**
**HALL OF RECORDS , ROOM 130**
**465 MARTIN LUTHER KING Jr. Blvd**
**NEWARK NJ 07102**

| INSTRUMENT NUMBER: | DOCUMENT TYPE : |
|---|---|
| **7111008** | **MORTGAGE** |

**Official Use Only**

CAROLE A. GRAVES, REGISTER
ESSEX COUNTY, NJ

INSTRUMENT NUMBER
7111008
RECORDED ON
August 31, 2007  11:18 am
BOOK:12084  PAGE:5404

MH

MAIL COPY _____
NO COPY _____
ENVELOPE _____

**Return Address** *(for recorded documents)*

WEICHERT FINANCIAL SERVICES

225 LITTLETON ROAD

MORRIS PLAINS NJ 07950

| No. Of Pages *(excluding Summary Sheet)* | | 16 |
|---|---|---|
| Recording Fee *(excluding Transfer Tax)* | | $180.00 |
| Realty Transfer Tax | | $0.00 |
| Amount Charged       (Check # 2010) | | $180.00 |
| Municipality | BLOOMFIELD | |
| Parcel Information | Block Lot | |
| First Party Name | ANGEL  VALENTIN | |
| Second Party Name | WEICHERT FINANCIAL SERVICES | |

**ADDITIONAL STAMPINGS** _____

**Additional Information (Official Use Only)**

****************************** *DO  NOT REMOVE  THIS  PAGE.* ****************************
*COVER SHEET (DOCUMENT SUMMARY FORM) IS PART OF ESSEX COUNTY  FILING RECORD*
****************** *RETAIN THIS PAGE FOR FUTURE REFERENCE.* ******************

MBk 12084-5404
Rec. 8.31.07

Return To:

Weichert Financial Services
225 Littleton Road
Morris Plains, NJ 07950

Prepared By:

Darlene  Wardrick

APR 0 4 2011
ASSG'T REC'D
BK 12305 PAGE 9114

[Space Above This Line For Recording Data]

# MORTGAGE

MIN ██████████

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated August 17, 2007
together with all Riders to this document.
(B) "Borrower" is Angel Valentin and Carie A. Valentin, Husband and Wife

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3031 1/01

-6A(NJ) (0005).02

Page 1 of 16        Initials: A.V. CV

VMP MORTGAGE FORMS - (800)521-7291

**(D) "Lender" is Weichert Financial Services**

Lender is a Corporation
organized and existing under the laws of New Jersey
Lender's address is 225 Littleton Road, Morris Plains, NJ 07950

**(E)** "Note" means the promissory note signed by Borrower and dated August 17, 2007
The Note states that Borrower owes Lender Three Hundred Twenty-five Thousand And
00/100                                                                    Dollars
(U.S. $325,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than September 1, 2037
**(F)** "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H)** "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |
| | | Description |

**(I)** "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J)** "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K)** "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L)** "Escrow Items" means those items that are described in Section 3.
**(M)** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N)** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O)** "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

Initials: A.V. P.

-6A(NJ) (0004).02                          Page 2 of 16                          Form 3031 1/01

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
County of Essex :
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

See attached description. Being the same premises conveyed to the mortgagors herein mentioned by deed dated and recorded simultaneously herewith. The within mortgage is a first purchase money mortgage, the consideration for which constitutes part of the purchase price of the property. Being also designated as lot 7 in block 427 on the tax map of the Township of Bloomfield, County of Essex and State of New Jersey. The above description is drawn in accordance with a survey prepared by James P. Deady, PLS dated August 1, 2007.

Property Account Number:                         which currently has the address of
66 Newark Avenue                                              [Street]
Bloomfield Township                    [City], New Jersey 07003          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

-6A(NJ) (0005).02                        Page 3 of 16          Initials: R.V.(W)          Form 3031 1/01

**Fidelity National Title Ins Co**

**Commitment**

Agent File No.: W-216164

**SCHEDULE C**
**DESCRIPTION**

All that certain tract or parcel of land, situated, lying and being in the Township of Bloomfield in the County of Essex and the State of New Jersey, more particularly described as follows:

BEGINNING at a point in the Northerly line of Newark Avenue 61 feet Westerly from the Northwest corner of the same and Baldwin Place; thence

(1) Running North 42 degrees 15 minutes East 125 feet; thence

(2) North 47 degrees 45 minutes West 35 feet to land now or formerly of Fred Heckel; thence

(3) Along said Heckel's land South 42 degrees 15 minutes West 125 feet to the Northerly line of Newark Avenue; and thence

(4) Along said Northerly side line of Newark Avenue South 47 degrees 45 minutes East 35 feet to the point or place of BEGINNING.

The above description was drawn in accordance with a survey prepared by James P. Deady, P.L.S. dated 8/01/2007.

FOR INFORMATIONAL PURPOSES ONLY: BEING known as Lot 7, Block 427 of the official Tax Map of the Township of Bloomfield.

(W-216164,FFD/W-215164/2d)

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, ▮▮▮▮▮▮▮

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

-6A(NJ) (0005).02                    Page 13 of 15               Initials: A.V.U            Form 3031 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

ALEX M. LaTORRACA
Attorney at Law
State of New Jersey

_____ (Seal)
Angel Valentin           -Borrower

_____

ALEX M. LaTORRACA
Attorney at Law
State of New Jersey

_____ (Seal)
Carle A. Valentin        -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

-6A(NJ) (0009).02                    Page 14 of 15                    Form 3031 1/01

STATE OF NEW JERSEY,    *Essex*                    County ss:

On this 17th          day of August, 2007          , before me, the subscriber,
personally appeared Angel Valentin & Carie A. Valentin

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

Notary Public

ALEX M. LaTORRACA
Attorney at Law
State of New Jersey

-6A(NJ) (0608).02                    Page 15 of 15          Initials_____          Form 3031 1/01

# RECORDING INFORMATION SHEET

**ESSEX COUNTY REGISTER'S OFFICE**
**HALL OF RECORDS , ROOM 130**
**465 MARTIN LUTHER KING Jr. Blvd**
**NEWARK NJ 07102**

| INSTRUMENT NUMBER: | DOCUMENT TYPE : |
|---|---|
| **13073579** | **MORTGAGE MODIFICATION** |

**Official Use Only**

PHILIP THIGPEN, REGISTER
ESSEX COUNTY, NJ

INSTRUMENT NUMBER
13073579
RECORDED ON
August 16, 2013  02:29 pm
BOOK:12452 PAGE:837

AC

MAIL COPY  _____
NO COPY  _____
ENVELOPE  _____

ADDITIONAL STAMPINGS  _____

**Return Address** *(for recorded documents)*
INDEPENDENT SETTLEMENT SERVICES
100 HIGH TOWER BLVD

SUITE 400
PITTSBURGH PA 15205

| No. Of Pages *(excluding Summary Sheet)* | | 12 |
|---|---|---|
| **Recording Fee** *(excluding Transfer Tax)* | | $150.00 |
| **Realty Transfer Tax** | | $0.00 |
| **Amount Charged**    (Check # 31574) | | $150.00 |
| **Municipality** | | |
| **Parcel Information** | **Block** | |
| | **Lot** | |
| **First Party Name** | SETERUS INC | |
| **Second Party Name** | ANGEL VALENTIN | |

**Additional Information (Official Use Only)**

*********************** *DO NOT REMOVE THIS PAGE.*************************
*COVER SHEET (DOCUMENT SUMMARY FORM) IS PART OF ESSEX COUNTY FILING RECORD*
******************* *RETAIN THIS PAGE FOR FUTURE REFERENCE.* *******************

R 12452-837
Rec. 8.16.13

Investor Loan # ███████

After Recording Please Return To:
Independent Settlement Services
100 High Tower Blvd., Suite 400
Pittsburgh, PA  15205

This document was prepared by Seterus, Inc.

.................................... [Space Above This Line For Recording Data] ....................................

*Potatowalo*: Lot - Block.
              429-7

Loan Number:
Investor Loan #: ███████

Nationwide Mortgage Licensing System
S.A.F.E. Act Servicer ID Number: 2315
S.A.F.E. Act Employee ID Number: 22547

# HOME AFFORDABLE MODIFICATION AGREEMENT
## (Step Two of Two-Step Documentation Process)

1-6-13

**L710E**
Borrower ("I"): [1] ANGEL VALENTIN
Lender or Servicer ("Servicer"): Seterus, Inc.
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): August 17, 2007
Loan Number: ███████
Property Address ["see Exhibit "A" attached hereto and made a part of thereof"] ("Property"): 65
NEWARK AVE, BLOOMFIELD, NJ 07003

If my representations in Section 1 continue to be true in all material respects, then this Home Affordable
Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the
Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together,
as they may previously have been amended, are referred to as the "Loan Documents". Capitalized terms
used in this Agreement and not defined have the meaning given to them in Loan Documents.

---

[1]    If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document
       words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

Contract Code  DDJ

HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3157   3/09 (rev. 8/09)                                                           *pages)*

I understand that after I sign and return two copies of this Agreement to the Servicer, the Servicer will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.    **My Representations.** I certify, represent to Servicer and agree:

   A.    I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

   B.    I live in the Property as my principal residence, and the Property has not been condemned;

   C.    There has been no change in the ownership of the Property since I signed the Loan Documents;

   D.    I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification program ("Program"));

   E.    Under penalty of perjury, all documents and information I have provided to Servicer in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

   F.    If Servicer requires me to obtain credit counseling in connection with the Program, I will do so; and

   G.    I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

2.    **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

   A.    If prior to the Modification Effective Date as set forth in Section 3 the Servicer determines that any of my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Servicer will have all of the rights and remedies provided by the Loan Documents; and

   B.    I understand that the Loan Documents will not be modified unless and until (i) I receive from the Servicer a copy of this Agreement signed by the Servicer, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.    **The Modification.** If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on February 01, 2013  (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect. The first modified payment will be due on February 01, 2013.

   A.    The new Maturity Date will be: September 01, 2049.

   B.    The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid

Amounts") less any amounts paid to the Servicer but not previously credited to my Loan. The new principal balance of my Note will be $473,933.23 (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.  Interest at the rate of 2.000% will begin to accrue on the New Principal Balance as of January 01, 2013 and the first new monthly payment on the New Principal Balance will be due on February 01, 2013. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------------------|------------------------------------------|------------------------|-------------------|----------------------------|
| 1-5   | 2.000         | 01/01/2013                | $1,520.77                                     | $1,352.83 May adjust periodically        | $2,873.60 May adjust periodically | 02/01/2013 | 60 |
| 6     | 3.000         | 01/01/2018                | $1,745.48                                     | $1,352.83 May adjust periodically        | $3,098.31 May adjust periodically | 02/01/2018 | 12 |
| 7-37  | 3.375         | 01/01/2019                | $1,831.89                                     | $1,352.83 May adjust periodically        | $3,184.72 May adjust periodically | 02/01/2019 | 368 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan. My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3157   3/09  (rev. 8/09)                                                                              pages)

4.  **Additional Agreements. I agree to the following:**

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Servicer has waived this requirement in writing.

B.  That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Servicer.

C.  To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.  I will pay to Servicer on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Servicer under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Servicer in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Servicer requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Servicer all notices of amounts to be paid under this Section 4.D. I shall pay Servicer the Funds for Escrow Items unless Servicer waives my obligation to pay the Funds for any or all Escrow Items. Servicer may waive my obligation to pay to Servicer Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Servicer and, if Servicer requires, shall furnish to Servicer receipts evidencing such payment within such time period as Servicer may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Servicer may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Servicer any such amount. Servicer may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Servicer all Funds, and in such amounts, that are then required under this Section 4.D.

Servicer may, at any time, collect and hold Funds in an amount (a) sufficient to permit Servicer to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a Servicer can require under RESPA. Servicer shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3157   3/09  (rev. 6/09)                                                                 (page 5 of 8 pages)

12/20/2016  12:08:24 PM                          ESSEX COUNTY                    Inst.# 13073579 - Page 5 of 13

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Servicer, if Servicer is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Servicer shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Servicer shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Servicer pays me interest on the Funds and applicable law permits Servicer to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Servicer shall not be required to pay me any interest or earnings on the Funds. Servicer and I can agree in writing, however, that interest shall be paid on the Funds. Servicer shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Servicer shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Servicer shall notify me as required by RESPA, and I shall pay to Servicer the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Servicer shall notify me as required by RESPA, and I shall pay to Servicer the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Servicer shall promptly refund to me any Funds held by Servicer.

E. That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Servicer and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Servicer's prior written consent, Servicer may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Servicer shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Servicer exercises this option, Servicer shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Servicer may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H. That, as of the Modification Effective Date, I understand that the Servicer will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3157   3/09  (rev. 8/09)                                                                 (Page 6 of 7 pages)

12/20/2016  12:08:24 PM                          ESSEX COUNTY                     Inst.# 13073579 - Page 6 of 13

I.     That, as of the Modification Effective Date, any provision in the Note, as amended, for the assessment of a penalty for full or partial prepayment of the Note must be waived with respect to any borrower "pay for performance".

J.     That, I will cooperate fully with Servicer in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Servicer's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Servicer does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.     That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

L.     Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Servicer including, but not limited to, releasing and canceling the mortgage loan.

M.     That Servicer will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Modification Agreement by Servicer to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (e) any HUD certified housing counselor.

HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3157   3/09 (rev. 8/09)        pages)

12/20/2016  12:08:24 PM      ESSEX COUNTY      Inst.# 13073579 - Page 7 of 13

N.    I agree that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Servicer's request to execute, acknowledge, initial and deliver to the Servicer any documentation the Servicer deems necessary.  If the original promissory note is replaced, the Servicer hereby indemnifies me against any loss associated with a demand on the original note. All documents the Servicer requests of me under this Section 4.N. shall be referred to as "Documents."  I agree to deliver the Documents within ten (10) days after I receive the Servicer's written request for such replacement.

In Witness Whereof, the Servicer and I have executed this Agreement.

_____          _____ (Seal)
Servicer Signature                                          Borrower  Signature
Seterus, Inc.                                                   ANGEL VALENTIN
**Lita Helmstetler**

                                                                    _____
By: _____                   Date

_____
Date                                     **George Ames**

Mortgage  Electronic  Registration  Systems,  Inc.
Nominee for Lender

_____
Fannie Mae ("Federal National Mortgage Association")
by Seterus, Inc. its attorney-in-fact

        **Heather Ashe**
_____ Space Below This Line For Notary Acknowledgement _____

HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3157   3/09 (rev. 8/09)

## ACKNOWLEDGEMENT

State of    New Jersey

County of    Hudson

On,    1/18/2013 before me,  Guilhermina Almeida    , personally appeared

Angel Valentin    ,    - - - - - - - -

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____  (Seal)

GUILHERMINA ALMEIDA
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 30, 2017

RE: ANGEL VALENTIN
12654098
L710 - HAMP Modification Agreement

F028B



State of Oregon

County of Washington

On 1/24/2013, before me, Lisa D. Burks, personally appeared Litu Helmstetler and
Heather Ashe, Authorized Signers of Seterus, Inc., and George Ames, Assistant
Secretary for Mortgage Electronic Registration Systems, Inc., who proved to me on
the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument.

WITNESS my hand and official seal.

> OFFICIAL SEAL
> LISA D BURKS
> NOTARY PUBLIC - OREGON
> COMMISSION NO. 458903
> MY COMMISSION EXPIRES MARCH 17, 2015

Lisa D. Burks, Notary Public
State of Oregon

My commission expires on: March 17, 2015

Commission No. ▆▆▆▆

## · EXHIBIT A

ALL THAT CERTAIN TRACT OR PARCEL OF LAND, SITUATED, LYING AND BEING IN THE TOWNSHIP OF BLOOMFIELD IN THE COUNTY OF ESSEX AND THE STATE OF NEW JERSEY, MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN THE NORTHERLY LINE OF NEWARK AVENUE 81 FEET WESTERLY FROM THE NORTHWEST CORNER OF THE SAME AND BALDWIN PLACE; THENCE 1 RUNNING NORTH 42 DEGREES 15 MINUTES EAST 125 FEET; THENCE 2 NORTH 47 DEGREES 45 MINUTES WEST 35 FEET TO LAND NOW OR FORMERLY OF FRED HECKLE; THENCE 3 ALONG SAID HECKLES LAND SOUTH 42 DEGREES 15 MINUTES WEST 125 FEET TO THE NORTHERLY LINE OF NEWARK AVENUE; AND THENCE 4 ALONG SAID NORTHERLY SIDE LINE OF NEWARK AVENUE SOUTH 47 DEGREES 45 MINUTES EAST 35 FEET TO THE POINT OR PLACE OF BEGINNING. THE ABOVE DESCRIPTION WAS DRAWN IN ACCORDANCE WITH A SURVEY PREPARED BY JAMES P. DEADY, P.L.S. DATED 8/01/2007.

Also Known As:  65 NEWARK AVE, BLOOMFIELD, NJ 07003

 ANGEL VALENTIN

F037A

EXHIBIT "B"

This Document was prepared by:

*Seterus, Inc.*
14523 SW Millikan Way
Suite 200
Beaverton, OR 97005

This Home Affordable Modification Agreement ("HAMP Modification Agreement") reflects the
modified terms of the Original Senior Lien as referenced below.

Original Mortgage

Date: 08/17/07

Borrower: ANGEL VALENTIN AND CARIE A. VALENTIN, HUSBAND AND WIFE

- Original principal amount : $325,000.00

Recording information: RECORDED ON : 08/31/07   VOL/PAGE/INSTRUMENT # 12084/5404

Original /Lender : MERS, INC AS NOMINEE FOR WEICHERT FINANCIAL SERVICES

———————————— [Space Above This Line For Recording Data] ————————————

██████████                                          Loan number: ████████

                                                    Investor loan number: ████████

## LOAN MODIFICATION AGREEMENT
### (Providing for Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made this 12th day of November, 2015, between VALENTIN, ANGEL ("Borrower") and Seterus, Inc. ("Servicer") Loan Servicer for Federal National Mortgage Association ("Lender"), and Mortgage Electronic Registration Systems, Inc. ("Mortgagee"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), and Timely Payment Rewards Rider, if any, dated August 17, 2007 and recorded in Book or Liber 12084, at page(s) 5404, Instrument Number 7111008, of the Essex Records of NJ and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property," located at

         65 NEWARK AVE, BLOOMFIELD NJ 07003-6043,

the real property described being set forth as follows:
         Property Legal Description - See Attached Exhibit A

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

VALENTIN, ANGEL    ██████████
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179  1.01 (rev. 06.12)    Page 1 of 10

1. As of December 01, 2015, the amount payable under the Note and the Security Instrument (the "New Principal Balance") is U.S. $535,399.37 consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2. $160,619.81 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and Borrower will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $374,779.56. Interest will be charged on the Interest Bearing Principal Balance at the yearly rate of 4.125%, from November 01, 2015. Borrower promises to make monthly payments of principal and interest of U.S. $1,595.61, beginning on the 1st day of December, 2015, and continuing thereafter on the same day of each succeeding month until the Interest Bearing Principal Balance and all accrued interest thereon have been paid in full. The yearly rate of 4.125% will remain in effect until the Interest Bearing Principal Balance and all accrued interest thereon have been paid in full. The new Maturity Date will be November 01, 2055.

3. Borrower agrees to pay in full the Deferred Principal Balance and any other amounts still owed under the Note and Security Instrument by the earliest of: (i) the date Borrower sells or transfers an interest in the Property, (ii) the date Borrower pays the entire Interest Bearing Principal Balance, or (iii) the new Maturity Date.

4. If Borrower makes a partial prepayment of Principal, the Servicer may apply that partial prepayment first to any Deferred Principal Balance before applying such partial prepayment to other amounts due.

5. In addition to the regularly scheduled payments that Borrower is required to pay under the Modification Agreement, Borrower agrees to pay Servicer an escrow payment in the amount of $1,570.23 for deposit into an escrow account for necessary payments to be made by Servicer, including but not limited to, payments for property taxes and insurance. As permitted by the Real Estate Settlement Procedures Act and other applicable law, Servicer may adjust the amount of the Escrow Payment. After notice of such adjustment, Borrower shall pay the adjusted Escrow Payment.
   (a) Each Escrow Payment shall be due on the same day(s) of the month as the regularly scheduled payments due under the Modification, commencing December 01, 2015.
   (b) In the event Escrow Payments are not made and Servicer advances its own funds to make payments that should have been paid from Borrower's escrow account, such amounts will be added to Borrower's loan obligation under the Note.
   (c) Any failure to make an Escrow Payment when due shall be deemed to be a default under the Note and Modification Agreement and upon Borrower's failure to pay the Escrow Payment, Servicer may exercise its rights under the Note and Modification Agreement.

(d) Unless an agreement is made in writing or applicable law requires interest to be paid on the escrow account payments held by Servicer, Servicer shall not be required to pay any interest or earnings on the payments held.

6. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

7. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:
   (a) all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note, including, where applicable, the Timely Payment Rewards rate reduction, as described in paragraph 1 of the Timely Payment Rewards Addendum to Note and paragraph A.1. of the Timely Payment Rewards Rider. By executing this Agreement, Borrower waives any Timely Payment Rewards rate reduction to which Borrower may have otherwise been entitled; and
   (b) all terms and provisions of any adjustable rate rider, or Timely Payment Rewards Rider, where applicable, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

8. Borrower understands and agrees that:
   (a) If Borrower has failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will be null and void.
   (b) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.
   (c) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the

Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(d) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(e) All administration and processing costs incurred by Servicer in connection with this Agreement, such as required notary fees, recordation fees, title costs and property valuation fees, shall be paid by the Servicer, unless otherwise stipulated.

(f) Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

(g) To execute other documents as may be reasonably necessary to correct an error (including but not limited to any inaccuracy, mistake or omission) if an error is detected after execution of this Agreement. In the event an error is detected, a corrected Agreement will be provided to Borrower, and this Agreement will be void and of no legal effect upon notice of such error. If Borrower elects not to sign any such corrected Agreement, the terms of the original Note and Security Instrument shall continue in full force and effect and such terms will not be modified by this Agreement.

(h) MERS is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting as nominee for Lender and Lender's successors and assigns. MERS is the Mortgagee/Beneficiary of record under the Security Instrument and this Agreement. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. 888.679.MERS.

9. Notwithstanding anything to the contrary contained in this Agreement, Borrower and Lender acknowledge the effect of a discharge in bankruptcy that has been granted to Borrower prior to the execution of this Agreement and that Lender may not pursue Borrower for personal liability. However, Borrower acknowledges that Lender retains certain rights, including but not limited to the right to foreclose its lien evidenced by the Security Instrument under appropriate circumstances and as allowed by applicable law. The parties agree that the consideration for this Agreement is Lender's forbearance from presently exercising its rights and pursuing its remedies under the Security Instrument as a result of Borrower's default thereunder. Nothing in this Agreement shall be construed to be an attempt to collect against Borrower personally or an attempt to revive personal liability.

10. Borrower will pay to Lender on the day payments are due under the Loan Documents as
amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for
payment of amounts due for: (a) taxes and assessments and other items which can attain priority
over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground
rents on the Property, if any; (c) premiums for any and all insurance required by Lender under
the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in
lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents;
and (e) any community association dues, fees, and assessments that Lender requires to be
escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all
notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for
Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow
Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow
Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower
shall pay directly, when and where payable, the amounts due for any Escrow Items for which
payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender
receipts evidencing such payment within such time period as Lender may require. Borrower's
obligation to make such payments and to provide receipts shall for all purposes be deemed to be
a covenant and agreement contained in the Loan Documents, as the phrase "covenant and
agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly,
pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may
exercise its rights under the Loan Documents and this Agreement and pay such amount and
Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the
waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan
Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such
amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to
apply the Funds at the time specified under the Real Estate Settlement Procedures Act
("RESPA"), and (b) not to exceed the maximum amount a Lender can require under RESPA.
Lender shall estimate the amount of Funds due on the basis of current data and reasonable
estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency,
instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so
insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items
no later than the time specified under RESPA. Lender shall not charge Borrower for holding and
applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless
Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a
charge. Unless an agreement is made in writing or applicable law requires interest to be paid on
the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.
Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds.

Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

*If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.*

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

11. Any and all attorneys fees and legal costs incurred by Borrower or its representatives, with respect to this loan, will be the sole responsibility of the Borrower.

12. In the event of future default, Borrower authorizes Lender and Lender's successors and assigns, to share certain Borrower public and non-public personal information including, but not limited to (i) name, address, telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, and (v) payment history and information about Borrower's account balances and activity, with an authorized third party, which may include, but is not limited to, a counseling agency, state or local Housing Finance Agency, or similar entity that is assisting Borrower in connection with obtaining a foreclosure prevention alternative, including the Trial Period Plan to modify Borrower's loan ("Authorized Third Party").

Borrower understands and consents to Lender or Authorized Third Party, as well as Fannie Mae (the owner of Borrower's loan), disclosing such personal information and the terms of any relief or foreclosure prevention alternative, including the terms of the Trial Period Plan to modify Borrower's loan, to any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with the loan or any other mortgage loan secured by the Property on which Borrower is obligated.

Borrower consents to being contacted by Fannie Mae, Lender, or Authorized Third Party concerning mortgage assistance relating to Borrower's loan including the Trial Period Plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Authorized Third Party.

By checking this box, Borrower also consents to being contacted by text messaging. ☐

VALENTIN, ANGEL ▮▮▮▮▮▮
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179  1.01 (rev. 06.12)    Page 6 of 10

In Witness Whereof, the Servicer and I have executed this Agreement.

_____     _____
Seterus, Inc.  Authorized Signer                                              Date

*Angel L Valentin*                                                          11-25-15
VALENTIN, ANGEL                                                              Date


_____
Mortgage Electronic Registration Systems, Inc., Assistant Secretary


_____ [Space Below This Line For Acknowledgments] _____

### CERTIFICATE OF ACKNOWLEDGMENT

State of **NEW JERSEY**                               )
                                                      )
County of ____Essex____                               )

On the ___25th___ day of ___November_____, ___2015___
before me, ___Angel L. Valentin_____, a Notary Public of the State
and County aforesaid personally appeared **VALENTIN, ANGEL**, who I am satisfied is/are the Person(s) named in
and who executed the within instrument; and he/she/they signed, sealed and delivered the same as
his/her/their act and deed for the uses and purposes therein expressed.

*Evelyn Valentin*
_____
Notary Public

EVELYN VALENTIN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES FEB. 29, 2016

(SEAL)
My Commission Expires: _____


VALENTIN, ANGEL   ▇▇▇▇▇
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179  1.01 (rev. 06.12)    Page 7 of 10

State of OREGON
County of WASHINGTON   SS.:

I CERTIFY that on *November 25, 2015* *Angel L. Valentin*
personally came before me and stated to my satisfaction that this person (or if more than one, each person):
(a) was the maker of the attached instrument;
(b) was authorized to and did execute this instrument as Authorized Signer of Seterus, Inc., the entity named in this instrument; and,
(c) executed this instrument as the act of the entity named in this instrument.

**EVELYN VALENTIN**
NOTARY PUBLIC OF NEW JERSEY
(SEAL)   MY COMMISSION EXPIRES FEB. 29, 2016
My Commission expires: _____

Name and Title
Printed Name: *Evelyn Valentin*

VALENTIN, ANGEL▮▮▮▮
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT     Form 3179  1.01 (rev. 06.12)     Page 8 of 10

State of OREGON
County of WASHINGTON    SS.:

I CERTIFY that on _November 25, 2015,    Angel L. Valentin_
personally came before me and stated to my satisfaction that this person (or if more than one, each person):
(a) was the maker of the attached instrument;
(b) was authorized to and did execute this instrument as Assistant Secretary for Mortgage Electronic
Registration Systems, Inc., the entity named in this instrument; and,
(c) executed this instrument as the act of the entity named in this instrument.

_Evelyn Valentin - Serv. Mgr._
Name and Title

EVELYN VALENTIN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES FEB. 29, 2016

(SEAL)
Printed Name: _Evelyn Valentin_
My Commission expires: _____

VALENTIN, ANGEL ████
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179  1.01 (rev. 06.12)    Page 9 of 10

**Exhibit A**

All that certain tract or parcel of land, situated, lying and being in the Township of Bloomfield in the County of Essex and the State of New Jersey, more parUculady described as follows: BEGINNING at a point in the Northerly line of Newark Avenue 81 feet Westerly from the Northwest comer of the same and Baldwin Place; thence (1) Running North 42 degrees 15 minutes East 125 feet; thence (2) North 47 degrees 45 minutes West 35 feet to land now or formerly of Fred Heckel; thence (3) Along said Heckel?s land South 42 degrees 15 minutes West 125 feet to the Northerly line of Newark Avenue; and thence (4) Along said Northerly side line of Newark Avenue South 47 degrees 45 minutes East 35 feet to the point or place of BEGINNING. The above descript(on was drawn in accordance with a survey prepared by James P. Deady, P.L.S. dated 810112007. FOR INFORMATIONAL PURPOSES ONLY: BEING known as Lot 7, Block 427 of the official Tax Map of the Township of Bloomfield.

Also Known As: 65 NEWARK AVE, BLOOMFIELD, NJ 07003-6043

# RECORDING INFORMATION SHEET

**ESSEX COUNTY  REGISTER'S OFFICE**
**HALL OF RECORDS , ROOM 130**
**465 MARTIN LUTHER KING Jr. Blvd**
**NEWARK NJ 07102**

| INSTRUMENT NUMBER: 11027660 | DOCUMENT TYPE : **ASSIGNMENT OF MORTGAGE** |
|---|---|

**Official Use Only**

PHILIP THIGPEN, REGISTER
ESSEX COUNTY, NJ

INSTRUMENT NUMBER
11027660
RECORDED ON
April 4, 2011  10:52 am
BOOK:12305  PAGE:9114

MC

MAIL COPY  _____
NO COPY  _____
ENVELOPE  _____

ADDITIONAL STAMPINGS

**Return Address** *(for recorded documents)*
LBPS
14523 SW MILLIKAN WAY

#200
BEAVERTON OR 97005

| No. Of Pages *(excluding Summary Sheet)* | | 2 |
|---|---|---|
| Recording Fee *(excluding Transfer Tax)* | | $50.00 |
| Realty Transfer Tax | | $0.00 |
| Amount Charged  (Check # 8924) | | $50.00 |
| Municipality | BLOOMFIELD | |
| Parcel Information | Block | |
|  | Lot | |
| First Party Name | WEICHERT FINANCIAL SERVICES | |
| Second Party Name | FEDERAL NATIONAL MORTGAGE ASSO | |

Additional Information (Official Use Only)

******************************* *DO NOT REMOVE THIS PAGE.*********************************
*COVER SHEET (DOCUMENT SUMMARY FORM) IS PART OF ESSEX COUNTY  FILING RECORD*
******************* *RETAIN THIS PAGE FOR FUTURE REFERENCE.********************

A 12305 - 9114
Rec. 4.4.11

# NEW JERSEY

COUNTY OF **ESSEX**

LOAN NO. ███████████

POOL NO. *C11-11251*

███████████████████

Assignment-Interv.-Recorded

PREPARED BY:
SECURITY CONNECTIONS, INC.
WHEN RECORDED MAIL TO:
**LBPS**
14523 SW MILLIKAN WAY, #200
BEAVERTON, OR 97005
ATTN

# ASSIGNMENT OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS: That on the 15th day of **FEBRUARY** , _2011_ but effective _____,
**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. SOLELY AS NOMINEE FOR WEICHERT**
**FINANCIAL SERVICES 1901 E VOORHEES ST. SUITE C, , DANVILLE, IL 61834**
_____, Party of the First Part,
in consideration of the sum of One Dollar ($1.00) lawful money of the United States of America and other good
and valuable consideration, to it in hand paid by **FEDERAL NATIONAL MORTGAGE ASSOCIATION 14221**
**DALLAS PARKWAY, SUITE 1000 DALLAS, TX 75254**
_____, Party of the Second Part,
at or before delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained,
sold, assigned, transferred and set over unto the said Party of the Second Part, its successors or assigns,
a certain Indenture of Mortgage, dated the __17th__ day of _____**AUGUST**_____ , _2007_ , made
by **ANGEL VALENTIN AND CARIE A VALENTIN HUSBAND AND WIFE**
_____
to secure the payment of the sum of _THREE HUNDRED TWENTY-FIVE THOUSAND and NO/100-----_
(§ 325,000.00 ) Dollars for the property located in the **TOWNSHIP** of **BLOOMFIELD**
which Mortgage is recorded in the Office of the County Clerk of **ESSEX** and State of New Jersey,
recorded on __AUGUST 31, 2007__ in Document No. _7111008_ , Book _12084_
or Mortgages, Page _5404_ .
PROPERTY ADDRESS: **65 NEWARK AVENUE BLOOMFIELD TOWNSHIP, NJ 07003**

TOGETHER with the bond or obligation therein described, and the money due and to grow due thereon, with the
interest. To have and to hold the same unto the said Party of the Second Part, its successors or assigns
forever, subject to the provision in the said Indenture of Mortgage mentioned; and it does hereby make,
constitute, and appoint the said Party of the Second Part its true and lawful attorney, irrevocable, in its
name, or otherwise, but at its proper costs and charges, to have, use and take all lawful ways and means for
the recovery of all the said money and interest; and in case of payment, to discharge the same as fully as it
might or could do if these presents were not made.

████████████

Loan No.

(NMRI.NJ)

MIN ████████████     **MERS PHONE: 1-888-679-6377**

*P=S.002.00526.301*
*C=s.014.0061*

*J=LB8040110AI.s.26107*

Page 1 of 2

LOAN NO. ███████

In Witness Whereof, the said Party of the First Part hath caused this instrument's execution; attested by its
_____, and these presents to be signed by its
*ASSISTANT SECRETARY*_____, This *FEBRUARY 15, 2011*_____,
but effective _____.


MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
SOLELY AS NOMINEE FOR NETCHER FINANCIAL SERVICES

WITNESS *APRIL HAJEK*

BY_____                    BY_____
                                               *TIFFANY BITSOI*
                                               *ASSISTANT SECRETARY*


STATE OF *IDAHO*_____}
                               }
COUNTY OF *BONNEVILLE*_____}

On the *15th* day of *FEBRUARY*_____, *2011*, before me, *MELISSA HIVELY*_____,
personally appeared *TIFFANY BITSOI*_____ and _____
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) who executed
the within instrument as *ASSISTANT SECRETARY*_____
and _____ on behalf of the
*MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.*_____
_____,
pursuant to its by-laws or a resolution of the board of directors of the said Corporation; and for the voluntary
act and deed of said Corporation, in presence of deponent, who thereupon subscribed his / her name thereto as
attesting witness.    WITNESS my hand and official seal.
*ESSEX COUNTY ACCOUNT NUMBER: 7794*

*MELISSA HIVELY* (COMMISSION EXP. 07-28-14)
NOTARY PUBLIC

```
MELISSA HIVELY
NOTARY PUBLIC
STATE OF IDAHO
```

[NMRI.NJ.2]                    *MIN* ███████          *MERS PHONE: 1-888-679-6377*
P=8.002.00526.301              Page 2 of 2
C=s.014.0061                   J=LB8040110AI.s.26107

True and certified copy of what was sent to

*David LaRose*

When Recorded Return To:
Nationstar Mortgage LLC
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683 7620

## ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **FEDERAL NATIONAL MORTGAGE ASSOCIATION, WHOSE ADDRESS IS C/O NATIONSTAR MORTGAGE LLC, 8950 CYPRESS WATERS BLVD., COPPELL, TX 75019, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to **NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER, WHOSE ADDRESS IS 8950 CYPRESS WATERS BLVD., COPPELL, TX 75019 (469)549-2000, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Mortgage in the amount of $325,000.00, dated on 08/17/2007, made by **ANGEL VALENTIN AND CARIE A. VALENTIN** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WEICHERT FINANCIAL SERVICES, ITS SUCCESSORS AND ASSIGNS**, and recorded on 08/31/2007, in Mortgage **Book 12084 and Page 5404**, in the office of the Register of Titles and County Recorder in **ESSEX** County, **New Jersey**.
Property is commonly known as: 65 NEWARK AVENUE BLOOMFIELD TWP
BLOOMFIELD TOWNSHIP, NJ 07003.
**Dated this 11th day of April in the year 2019.**
**FEDERAL NATIONAL MORTGAGE ASSOCIATION, by NATIONSTAR MORTGAGE LLC, its Attorney-in-Fact (POA RECORDED: 04/05/2019 INST# 2019031653)**

**KRISTIN PRICE**

**Vice President of Loan Documentation**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA    COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on this 11th day of April in the year 2019, by Kristin Price as Vice President of Loan Documentation of NATIONSTAR MORTGAGE LLC as Attorney-in-Fact for FEDERAL NATIONAL MORTGAGE ASSOCIATION, who, as such Vice President of Loan Documentation being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

**JULIE MARTENS**
**COMM EXPIRES: 5/22/2022**

JULIE MARTENS
Notary Public - State of Florida
Commission # GG 221059
My Comm. Expires May 22, 2022
Bonded through National Notary Assn.

**Document Prepared By: Dave LaRose/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**